1
2
3                          UNITED STATES DISTRICT COURT
4                                 DISTRICT OF NEVADA
5                                        * * *
6    In re:                                      Case No. 3:19-cv-00637-MMD

7    X-TREME BULLETS, INC.,                             Member Cases:

8                                    Debtor.    3:19-cv-666-MMD, 3:19-cv-667-MMD,
                                                     and 3:20-cv-00117- MMD
9
     HOWELL MUNITIONS & TECHNOLOGY,
10   INC., AMMO LOAD WORLDWIDE, INC.,
     CLEARWATER BULLET, INC., HOWELL       Jointly Administered Under Bankruptcy.
11   MACHINE, INC., FREEDOM                 Case No. 18-50609-BTB (Lead Case)
     MUNITIONS, LLC, LEWIS-CLARK
12   AMMUNITION COMPONENTS, LLC, and              Chapter 11
     COMPONENTS EXCHANGE, LLC,
13
              Jointly Administrated Debtors.
14
     UNITED STATES OF AMERICA
15   DEPARTMENT OF THE TREASURY                     ORDER
     ALCOHOL AND TOBACCO TAX AND
16   TRADE BUREAU,

17                                 Appellant,
18            v.

19   X-TREME BULLETS, INC., AMMO LOAD
     WORLDWIDE, INC., CLEARWATER
20   BULLET, INC., FREEDOM MUNITIONS,
     LLC, HOWELL MACHINE, INC.,
21   HOWELL MUNITIONS & TECHNOLOGY,
     INC., LEWIS-CLARK AMMUNITION
22   COMPONENTS, LLC, COMPONENTS
     EXCHANGE, LLC, KASH CA, INC.;
23   DAVID HOWELL, Z.B. N.A. dba ZIONS
     FIRST NATIONAL BANK, CFO
24   SOLUTIONS, LLC dba ADVANCED CFO,
     Matthew McKinlay and Valerie Grindle,
25
                                  Appellees.
26
27   ///
28   ///

## I.    SUMMARY

This is a consolidated appeal from the United States Bankruptcy Court for the District of Nevada ("Bankruptcy Court") from jointly administered Chapter 11 bankruptcy proceedings. This order concerns the first three of four appeals ("the Appeals") by Appellant the United States of America, on behalf of the Department of the Treasury Alcohol and Tobacco Tax and Trade Bureau ("TTB"), challenging multiple orders the Bankruptcy Court issued. (ECF No. 32.) Debtors and debtors-in-possession—X-Treme Bullets, Inc., Ammo Load Worldwide, Inc., Clearwater Bullet, Inc., Freedom Munitions, LLC, Howell Machine, Inc., Howell Munitions & Technology, Inc. ("HMT"), Lewis-Clark Ammunition and Components, LLC and Components Exchange, LLC (collectively, "Debtors-Appellees")—have moved to dismiss the Appeals ("MTD").[1] (ECF No. 22.) They specifically challenge TTB's standing to bring the Appeals and make claims of mootness. For the reasons stated below, the Court agrees that the Appeals should be dismissed on mootness grounds.

## II.    BACKGROUND

The following facts are not in dispute and are based on the records before the Court.

Debtors-Appellees filed Chapter 11 petitions for relief in the Bankruptcy Court on June 8, 2018. (ECF No. 24-2 at 2.) Their Chapter 11 bankruptcies were jointly administered under Bankruptcy Case No. 3:18-bk-50609-BTB. (*Id.*) Appellees include Zions Bancorporation, N.A. dba Zions First National Bank ("Zions"), who was Debtors-Appellees' primary pre-petition secured creditor. (ECF No. 62-2 at 7, 27–28.)

On July 19, 2018, Zions filed a proof of claim ("POC") against all Debtors-Appellees for approximately $17,529,219 ("Secured Claim"). (*Id.*; *see also id.* at 434–35 (explaining the Secured Claim); ECF No. 33-5 at 185.) Appellee Kash CA, Inc. ("Kash") acquired from

///

---

[1]In addition to the MTD, the Court has considered the related response (ECF No. 26), reply (ECF No. 29), addendum (ECF No. 36), and joinders (ECF Nos. 25, 31, 35, 42). The Court has also reviewed the associated substantive appellate briefing. (ECF Nos. 32 (opening brief), 43 (answering brief), 45 (joinder), 49 (joinder), 50 (reply brief).)

1   Zions Zions' Secured Claim, and the liens encumbering the assets of Debtors-Appellees,

2   and non-debtor affiliates of the Debtors-Appellees, Twin River Contract Loading, Inc.

3   ("Twin River") and Big Canyon Environmental, LLC ("Big Canyon"), by paying Zions $8.8

4   million cash in September 2019. (ECF No. 62-2 at 25, 30–31 (declaration of Angela Smith,

5   Debtors-Appellees' Chief Financial Officer).) This agreement between Zion and Kash is

6   called the Kash Loan Purchase Agreement. (*Id.*) A separate agreement—the Kash Asset

7   Purchase Agreement (ECF No. 24-1), ultimately resulted in Kash's purchase of the assets

8   from Debtors-Appellees.

9          David C. Howell ("Howell") is the principal of each of the Debtors-Appellees. (ECF

10   No. 62-2 at 5, 26.)[2] Howell and the President of Kash, Daniel Kash, had been close

11   acquaintances and friends for several years in the ammunitions business. (ECF No. 33-7

12   at 19 (declaration of Daniel Kash).) However, according to Kash, Howell had no interest

13   in Kash's business although he was initially listed as Kash's designated registered agent

14   in Idaho. (*Id.* at 19–20.)

15          Solely in HMT's bankruptcy case, TTB has asserted its security interest based on

16   a federal tax lien ("Lien") assessed against non-debtor Twin River. (*E.g.*, ECF No. 33-3 at

17   125; ECF No. 62-1 at 461–72; *see also* ECF No. 33-3 at 178 (Debtors-Appellees' counsel

18   explaining that there is no dispute that TTB has a valid claim against Twin River).) The

19   Lien was filed in January 2017. (ECF No. 62-1 at 461–72.)  It arose from Twin River's

20   failure to pay federal excise taxes, pursuant to 26 U.S.C. § 6201, for Twin River's

21   manufacture of ammunition. (*See* ECF No. 62-1 at 465, 468.) TTB ultimately filed a POC

22   in HMT's bankruptcy case to recover on the Lien ("TTB Claim"), and also contended, *inter*

23   *alia*, that the bankruptcy estate had consolidated therein assets of non-debtor Twin Rivers

24   to which the Lien attached. (*E.g.*, ECF No. 33-3 at 125–26; ECF No. 62-1 at 461–72.)

25   ///

---

26          [2]The Debtors-Appellees' respective business operations included the manufacture
27   of bullets; the manufacture of ammoload machines and other machines; the fabrication of
     parts that were used to build the ammoload machines; and the manufacture of shell cases
28   and the sale of ammunition. (*E.g.*, ECF No. 62-2 at 26–27.) While the entities are legally
     separate, they have at all times operated on a consolidated basis. (ECF No. 33-3 at 51.)

1    TTB's contentions in the Bankruptcy Court were unavailing, resulting in TTB filing

2    four appeals from four separate orders that court issued—Case Nos. 3:19-cv-00637-

3    MMD, 3:19-cv-00666-MMD, 3:19-cv-00667-MMD, 3:20-cv-00117-MMD—concerning the

4    proceedings and related transactions. All four appeals have been consolidated under the

5    lead case number, Case No. 3:19-cv-00637-MMD.[3] TTB separately appealed the

6    Bankruptcy Court's order disallowing the TTB Claim ("Disallowance Order")—fourth

7    appeal. (ECF Nos. 61, 66, 69.) This Court has ruled on that appeal, finding the Bankruptcy

8    Court abused its discretion in failing to make sufficient findings in disallowing the TTB

9    Claim. (ECF No. 76.)

10        **A.    First Appeal—Case No. 3:19-cv-00637-MMD**

11   TTB challenges the Bankruptcy Court's decision to grant Debtors-Appellees'

12   motion requesting that the Bankruptcy Court approve three settlement agreements

13   ("Compromise Motion"). (*See* 3:19-cv-00637 (ECF No. 1-4).) The settlement agreements

14   are: the Zions Settlement Agreement (ECF No. 33-3 at 5–18); the Kash Settlement

15   Agreement (ECF No. 33-3 at 24–39); and the Howell Settlement Agreement. (*See* ECF

16   No. 33-3 at 244–46 (Order granting the Compromise Motion ("Compromise Order")).)

17   Details of these agreements are provided below.

18   TTB objected to the Compromise Motion in the Bankruptcy Court proceedings.

19   (ECF No. 33-3 at 124–29.) Debtors-Appellees replied to TTB's opposition arguing in gist

20   that the opposition was meritless and that there was good cause to grant the relief

21   requested in the Compromise Motion. (ECF No. 33-3 at 149–62.) A hearing was held

22   concerning the Compromise Motion on August 18, 2019. (*Id.* at 168–211.) After the parties'

23   arguments at the hearing,[4] the Bankruptcy Court decided to grant the Compromise Motion.

24   ///

25        [3]All citations to the docket are from the lead case number.

26        [4]At the hearing, counsel for Debtors-Appellees specifically noted that they were not

27   then seeking to resolve the disputed TTB Claim. (ECF No. 33-3 at 172.) Rather, they noted
     that only a limited issue was before the Court. (*Id.*) They were only seeking authorization
     for "debtors to enter into and to perform their obligations under the three settlement

28   agreements." (*Id.*) This would include:

4

1   (*Id.* at 206–07.) The Bankruptcy Court specifically stated "I'm granting the relief requested

2   in your motion" while expressing uncertainty as to what a drafted order would look like in

3   light of what was contended at the hearing. (*Id.*) Debtors-Appellees' counsel responded

4   that he had an order ready but would make slight modifications to state that "the Zions

5   claim is the first priority, duly perfected, unavoidable" to remediate concerns expressed by

6   Kash's counsel on the issue of priority. (*Id.* at 207.) The Bankruptcy Court responded:

7   "Okay. So go ahead and make those modifications." (*Id.*) The Compromise Order the

8   Court later entered approved the Zions Settlement Agreement, the Kash Settlement

9   Agreement and the Howell Settlement Agreement. (*E.g.*, *id.* at 245–46.)

10  ///

11  ///

12
13      some matters that are the subject of dispute with the TTB, and specifically,
        the debtors request that this Court enter an order authorizing the debtors to
14      affirm that Zions Bank has a first priority security interest encumbering the
        debtors' assets and that the debtors affirm that the buyer will have the right,
15      assuming that the buyer in fact closes on its acquisition of Zions secured
        claims, the buyer will have the right to credit bid under Section 363(k) of the
16      Bankruptcy Code up to the full amount of the Zions secured claim that it will
        acquire.

17  (*Id.*) Yet counsel for Debtors-Appellees provided lengthy contentions as to why the TTB
    Claim was, among other things, frivolous and its underlying lien not senior to Zions' lien
18  and asking the Bankruptcy Court to make the latter finding. (*Id.* at 177–84.) Counsel also
    consistently pulled back certain contentions as not then being before the Bankruptcy
19  Court. (*Id.*) TTB's counsel stated he was "puzzled" by Debtors-Appellees' counsel's
    arguments and noted he would not then address them because:
20
21      most of the argument that debtors' counsel proposed today is not before the
        Court today. It appears to be in the nature of an objection to the
22      Government's claim which has not been filed, and all of these issues are
        raised in our reply brief that was filed yesterday. So with the Court's
        permission, I'm not going to address those points.
23
24  (*Id.* at 194.) TTB counsel specifically noted that the issue of priority was "beyond the scope
    of today's hearing." (*Id.*) TTB's counsel's position at the hearing included that in spite of
25  the settlements, non-parties to the settlements are not accordingly bound. (*Id.* at 195–97.)
    TTB counsel also noted that as of the hearing, the TTB Claim had not been objected to.
26  (*Id.* at 198.) Zions' counsel thereafter offered his position that the Bankruptcy Court could
    "absolutely" rule on the priority issue. (*Id.*) Debtors-Appellees' counsel then noted that the
27  issue had been fully briefed. (*Id.* at 200.) Finally, Kash's counsel offered that it was key to
    the settlement agreements that, *inter alia*, there had to be "an *acknowledgment* as to the
28  amount, the scope, the validity, perfection, and enforceability of the Zions first priority
    secured claims." (*Id.* at 205 (emphasis added).)

The Zions Settlement Agreement was entered into by and among the Debtors-Appellees and non-debtor affiliates of the Debtors-Appellees, Twin River and Big Canyon, and Howell, on one hand, and Zions and CFO Solutions, LLC dba Advanced CFO, Matthew McKinlay, Valerie Grindle and Sussman Shank LLP ("Advanced CFO Parties"), on the other hand. (ECF No. 33-5 at 165–80; ECF No. 33-3 at 245.) The Zions Settlement Agreement was the result of Zions requiring, *as a condition to* it entering into the Kash Loan Purchase Agreement, that the Debtors-Appellees, Twin River, Big Canyon and Howell settle and release their claims against Zions. (*E.g.*, ECF No. 33-3 at 187 ("That's an absolute condition of [Zions]."); ECF No. 33-5 at 208.)

The Kash Settlement Agreement (ECF No. 33-5 at 184–204) was entered into by and among the Debtors-Appellees, Twin River, Big Canyon and Howell, on one hand, and Kash, on the other hand. Kash required, *as a condition to* its entering into the Kash Loan Purchase Agreement and the Kash Asset Purchase Agreement, that Debtors-Appellees, Twin River, Big Canyon and Howell enter into this settlement agreement with it. (*Id.* at 185–86, 208.) Under this agreement, Debtors-Appellees, Twin River, Big Canyon and Howell agreed to, among other things: (i) waive and release any and all claims that they may have against Kash; and (ii) waive any and all defenses to the loans, the liens and the loan documents related to Zions' Secured Claim *and affirm* that, upon the effectuation of the Kash Loan Purchase Agreement, Kash, as the assignee of Zions' Secured Claim, would hold a "valid, enforceable, non-avoidable, *perfected first-priority security interest in all property* of the [Debtors-Appellees] constituting Zions's collateral," in accordance with the terms and conditions of the Kash Settlement Agreement. (*Id.* at 186–88 (emphasis added).) In addition, the Debtors-Appellees acknowledged that, upon Kash's acquisition of Zions' Secured Claim, Kash would have the right, pursuant to section 363(k) of the Bankruptcy Code, to make a credit bid up to the full amount of the Secured Claim, to acquire substantially all of the assets and properties of the Debtors-Appellees pursuant to the Kash Asset Purchase Agreement. (*Id.* at 190–91.)

///

6

1   The Howell Settlement Agreement (ECF No. 33-5 at 205–23) was entered into by

2   and among the Debtors-Appellees and Twin River, on one hand, and Howell and certain

3   relatives and other affiliates of Howell ("Howell Parties"), on the other hand. (*Id.* at 191,

4   206.) Howell required, *as a condition to* his entering into the Zions Settlement Agreement

5   and the Kash Settlement Agreement and his giving the releases provided for thereby, that

6   the Debtors-Appellees waive and release claims against the Howell Parties. (*Id.* at 208–

7   09.)

8   **B.      Second Appeal—Case No. 3:19-cv-00666-MMD**

9   This appeal involves the Bankruptcy Court's order approving the sales procedures

10   for the sale of Debtors-Appellees' property ("Sales Procedures Order"). The underlying

11   Sales Procedures Memorandum (ECF No. 33-5 at 250–60) proposed to sell substantially

12   all of the assets and properties of Debtors-Appellees, including without limitation, Debtors-

13   Appellees' furniture, fixtures, equipment, inventory, intellectual property rights, and

14   accounts receivable associated with the operation of their businesses (collectively, the

15   "Marketed Assets"). (*E.g.*, *id.* at 250.)  The Sales Procedure Memorandum also noted that

16   Debtors-Appellees had retained J. Michael Issa of GlassRatner Advisory & Capital Group,

17   LLC to assist them as their Chief Restructuring Officer ("CRO") in connection with

18   supervising the operations of Debtors-Appellees' businesses and administering Debtors-

19   Appellees' bankruptcy cases. (*Id.*) Issa would be responsible for:

20   
21   
22   
23   
> supervising the marketing of the Marketed Assets; interfacing with prospective bidders regarding qualification of bidders with respect to their participation in the Auction and performance of diligence investigations with respect to a purchase of the Marketed Assets; and for conducting the Auction. [He would also] supervise the sale process, the evaluation of any bids made for the Marketed Assets and the selection of the "Successful Bidder"

24   (*Id.*) The Sales Procedure Memorandum further provided, among other things, that Kash

25   was to be the "Stalking Horse Bidder." (*Id.*) This meant that Debtors-Appellees had

26   accepted Kash's offer to purchase the Marketed Assets "subject to: (i) higher and/or better

27   offers; and (ii) the approval of the Bankruptcy Court." (*Id.*) The Sales Procedure

28   Memorandum provided that a sale would be by auction but also noted that Debtors-

7

1   Appellees intended to file a motion asking the Bankruptcy Court to assign and sell to the

2   Stalking Horse Bidder—Kash—the Marketed Assets subject to "any overbids." (*Id.* at 250–

3   51, 256.) A hearing was held at which TTB argued its objections to the Sales Procedure

4   Memorandum. (ECF No. 33-4 at 407–36.)  After that hearing the Bankruptcy Court entered

5   the Sales Procedures Order. (ECF No. 33-5 at 415–19.) That order approved the Sales

6   Procedures Memorandum and the sales and bidding procedures set forth therein as

7   governing "the proceedings for the sale of substantially all of the assets and properties of

8   the Debtors, including without limitation, any Auction that may be conducted in the

9   Debtors' cases." (*Id.* at 417.)

10          **C.    Third Appeal—Case No. 3:19-cv-00667-MMD**

11          In this challenged order, the Bankruptcy Court granted Debtors-Appellees' Motion

12   for Order Authorizing: (1) Sale of Substantially all of the Assets of the Debtors Free and

13   Clear of Liens and Interests in Accordance with the Provisions of Asset Purchase

14   Agreement; (2) Assumption and Assignment of Unexpired Leases and Executory

15   Contracts; and (3) Rejection of Unexpired Leases and Executory Contracts and

16   Abandonment of Property ("Sale Motion"). (*See* ECF No. 24-8 at 1–17.)  A hearing was

17   held on the Sale Motion on October 16, 2019. (ECF No. 33-7 at 184–290 (transcript).) At

18   that hearing, TTB contested, among other things, Kash being determined a good faith

19   purchaser, putting on a witness to contend otherwise. (*Id.* at 202, 217, 223–83

20   (examination of TTB's Witness Thomas Schmidt).) In the end the Bankruptcy Court

21   decided to "allow the sale and overrule the objection of the United -- of TTB." (*Id.* at 287.)

22   In doing so, the court recognized that: "The TTB is afraid that taxes won't be paid going

23   forward after the sale . . . but I think the reasons stated by the movant who wants to – who

24   wants the sale, by the preponderance of the evidence outweighed the objections of the

25   TTB." (*Id.* at 287–88.)[5] The order granting the Sale Motion ("Sale Order") found, *inter alia*:

26   ///

27          [5]Relatedly, Kash's counsel shortly before noted that Kash was "very mindful going
     forward that it has tax obligations that it will comply with when it steps into the shoes of
28   the debtors" (ECF No. 33-7 at 287.)

G. . . . The Debtors' entering into and consummating the Kash Asset Purchase Agreement is a sound exercise of the Debtors' business judgment. The Sale Transaction contemplated by the Kash Asset Purchase Agreement is in the best interests of the Debtors' creditors and estates.

H. Pursuant to the Court's Compromise Motion Order the Court has authorized Kash CA to make a credit bid to acquire the Purchased Assets up to the full amount of the Zions Secured Claim acquired by Kash CA from Zions. . . .

I. Good cause exists to authorize the Debtors to sell the Purchased Assets free and clear of all Liens of any kind or nature because the requirements set forth in section 363(f) of the Bankruptcy Code, including section 363(f)(4), have been satisfied**.**

J. The Kash Asset Purchase Agreement was negotiated, proposed and entered into by and among the Debtors and Kash CA without collusion, in good faith, and from arm's-length bargaining positions . . . Accordingly, upon consummation of the Sale Transaction contemplated by the Kash Asset Purchase Agreement, Kash CA will be a buyer in "good faith" within the meaning of section 363(m) of the Bankruptcy Code . . .

. . .

N. By the Sale Motion, the Debtors request that the Court authorize the sale only of property of the Debtors' estates under section 541 of the Bankruptcy Code, and not any property of any non-debtor entity. The Purchased Assets to be sold and assigned to Kash CA pursuant to the Kash Asset Purchase Agreement have been adequately disclosed and identified.

. . .

Q. Good cause exists to approve the Purchaser's Subordination Agreement[6] in connection with and in furtherance of the Sale Transaction. The Debtors have submitted legal authority and evidence adequate for the Court to approve the Purchaser's Subordination Agreement.

. . .

(ECF No. 24-8 at 1–17.)

///

///

///

_____

[6]Kash entered into this agreement with Debtors-Appellees as an integral part of the later Sale Transaction whereby Kash agreed to pay the purchase price provided in the Kash Asset Purchase Agreement by a carve-out of the Secured Claim that Kash would acquire pursuant to the Kash Loan Purchase Agreement. (*See* ECF No. 24-2.) Under the carve out, instead of keeping all proceeds of the Sale Transaction, Kash agreed instead to carve-out a portion of the proceeds to be placed in trust for the benefit of designated unsecured creditors of Debtors-Appellees. (*E.g.*, *id.* at 3–5.)

9

1    The sale of the purchased assets occurred on October 22, 2019 ("Sale

2    Transaction").[7] (ECF No. 33-8 at 182.) TTB thereafter sought a stay of the Sale

3    Transaction, which the Bankruptcy Court denied with prejudice after a hearing held on

4    January 7, 2020. (ECF No. 30 at 11–12; ECF No. 36-1 at 2–3.)  TTB did not appeal the

5    denial of the stay.

6    **III.    LEGAL STANDARD[8]**

7        This Court has jurisdiction to hear timely appeals from a judgment, order, or decree

8    of the Bankruptcy Court under 28 U.S.C. § 158(a).

9        The Court reviews "the bankruptcy court's conclusions of law *de novo* and its

10   findings of fact for clear error." *In re Bonham,* 229 F.3d 750, 762 (9th Cir. 2000). The

11   Bankruptcy Court's factual findings are clearly erroneous only if the findings "leave the

12   definite and firm conviction" that the Bankruptcy Court made a mistake. *In re Rains*, 428

13   F.3d 893, 900 (9th Cir. 2005). "A bankruptcy court abuses its discretion if it applies the law

14   incorrectly or if it rests its decision on a clearly erroneous finding of a material fact." *In re*

15   *Brotby*, 303 B.R. 177, 184 (B.A.P. 9th Cir. 2003). A bankruptcy court also abuses its

16   discretion where "it applies the wrong legal standard, misapplies the correct legal

17   standard, or if its factual findings are illogical, implausible, or without support in inferences

18   that may be drawn from the facts in the record." *In re Plyam*, 530 B.R. 456, 461 (B.A.P.

19   9th Cir. 2015).

20       Particularly material to the Appeals, a bankruptcy court's decision on a motion to

21   sell pursuant to section 363(b) is reviewed for abuse of discretion. *See, e.g.*, *Rosenberg*

22   *Real Estate Equity Fund III v. Air Beds, Inc. (In re Air Beds, Inc.),* 92 B.R. 419, 422 (9th

23   Cir. BAP 1988) (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel*

24   *Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) & *Big Shanty Land Corp. v. Comer Properties,*

25   ///

26       [7]TTB filed its third appeal on October 30, 2019. (ECF No. 1-2, Case No. 3:19-cv-00667-MMD.)

27

28       [8]To the extent the parties dispute the applicable standards of review (*e.g.*, ECF No. 32 at 5; ECF No. 43 at 14–17; ECF No. 50 at 6), the Court sets forth the applicable standards and does not address the matter further.

1  *Inc.,* 61 B.R. 272, 277 (N.D. Ga. 1985)). A bankruptcy court's finding of good faith is

2  primarily a factual determination which is reviewed for clear error. *E.g.*, *In re Taneja*, 743

3  F.3d 423, 429 (4th Cir.  2014); *Meeks v. Red River Entm't (In re Armstrong),* 285 F.3d

4  1092, 1096 (8th Cir. 2002) (citations omitted).

5      The  Court  may  affirm  the  bankruptcy  court's  decision  "on  any  ground  fairly

6  supported by the record." *In re Warren*, 568 F.3d 1113, 1116 (9th Cir. 2009).

7  **IV.    DISCUSSION**

8      In their MTD, Debtors-Appellees in gist argue: (1) the Appeals are statutorily moot

9  under Title 11 of the United States Code section 363(m); and (2) the Appeals are equitably

10  moot. (*See generally* ECF No. 22.) They later added a contention that TTB lacks standing

11  to pursue the Appeals in their reply brief. (*E.g.*, ECF No. 29 at 2, 4–5.)[9] The Court will

12  briefly *sua sponte* consider the standing issue. Further, because the Court agrees that the

13  Appeals are moot under section 363(m), the Court does not consider equitable mootness

14  and the merits of the parties' substantive contentions beyond the issue of Kash's status

15  as a good faith purchaser.

16      **A.    Standing**

17      "[W]hether  or  not  the  parties  raise  the  issue,  '[f]ederal  courts

18  are *required* sua sponte to examine jurisdictional issues such as standing.'" *D'Lil v. Best*

19  *W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) (alteration in original)

20  (citations and some internal quotation marks omitted). But it is not definitive that TTB lack

21  standing to pursue the Appeals.

22      Debtors-Appellees base their contention of a lack of standing on the ground that

23  the Bankruptcy Court disallowed the TTB Claim. (*E.g.*, ECF No. 29 at 2, 4–5.) As noted,

24  this  Court  has  issued  an  order  vacating  and  remanding  the  Disallowance  Order  for

25  insufficient findings. This may suggest that TTB may still have a pecuniary interest for

26  ///

27      [9]The standing argument was apparently added to Debtors-Appellees' reply brief
after the Dismissal Order was issued. (*E.g.*, ECF No. 29 at 2.) It was also raised in their
28  answering brief concerning the Appeals (ECF No. 43 at 18) and therefore TTB had an
opportunity to address the issue but did not (*see generally* ECF No. 50).

1 which it could obtain relief thereby precluding a finding of a lack of standing. *See, e.g.*, *In*

2 *re 240 N. Brand Partners, Ltd.*, 200 B.R. 653 (B.A.P. 9th Cir. 1996) ("In order to have

3 standing to appeal, a party must be "directly and adversely affected pecuniarily" by the

4 bankruptcy court decision.") (citations omitted). But it appears to the Court that at best

5 there is a bona fide dispute as to the Debtors-Appellees' liability to TTB and caselaw

6 supports that standing is lacking under such circumstances. *See, e.g.*, *Dep't of Revenue*

7 *v. Blixseth*, 942 F.3d 1179, 1187 (9th Cir. 2019) (concluding that standing is lacking to the

8 extent a claim is subject to a bona fide dispute on the petition date); *see also In re Dexter*

9 *Distrib. Corp.*, No. BAP AZ-09-1386MKKIJU, 2010 WL 6466583, at *5 n.15 (B.A.P. 9th

10 Cir. Oct. 21, 2010) ("Of course, if [appellant's] claim were disallowed in its entirety, he

11 would no longer be 'affected pecuniarily' by the bankruptcy court's fee award to [the

12 appellee] and thus would lack standing to appeal the fee award."). In light of the lack of

13 clarity as to standing, the Court will address mootness.

14     **B.    Statutory Mootness**

15     Even if TTB has standing, the Court concludes that the Appeals are statutorily moot.

16 Here, Debtors-Appellees specifically argue that the Appeals are statutorily moot under

17 section 363(m) because TTB indisputably failed to obtain a stay of the Sale Order, the

18 Sale Transaction has been closed and fully consummated and the relief granted in the

19 other orders—Compromise Order and Sales Procedures Order—were all *integral* to the

20 Sale Transaction. (ECF No. 22 at 16–33.)[10] Even considering the narrowed view of

21 mootness under recent Ninth Circuit caselaw, the Appeals are moot under section 363(m).

22     The section protects the rights of a good faith purchaser on appeal, providing that

23 [t]he reversal or modification on appeal of an authorization under subsection (b) ... of a sale or lease of property does *not* affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property *in good faith,* whether or not such entity knew of the pendency of the appeal, *unless such* ... *sale or lease were stayed pending appeal.*

26 ///

27 ─────────

28 [10]"The party moving for dismissal on mootness grounds bears a heavy burden." *Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 880 (9th Cir. 2012) (internal quotation and citation omitted).

1    11 U.S.C. § 363(m) (emphasis added). Debtors-Appellees essentially argue that the

2    Appeals are per se moot under section 363(m) for the lack of a stay. This position appears

3    to be supported by prior decisions in the majority of circuits. *See, e.g.*, *Mission Prod.*

4    *Holdings, Inc. v. Old Cold, LLC* (*In re Old Cold, LLC*), 879 F.3d 376, 383 (1st Cir. 2018)

5    (citation omitted) (explaining that section 363(m) has been interpreted "to render

6    statutorily moot *any* appellate challenge to a sale that is both to a good faith purchaser,

7    and not stayed") (emphasis added); *In re Parker*, 499 F.3d 616, 621 (6th Cir. 2007) ("A

8    majority of our sister circuits construe § 363(m) as creating a *per se* rule automatically

9    mooting appeals for failure to obtain a stay of the sale at issue.") (collecting cases).[11]

10           Recently, the Sixth Circuit has expressly sided with the Third and Tenth Circuits in

11   opting to follow the narrower alternative view of mootness under section 363(m). *See In*

12   *re Brown ("Brown")*, 851 F.3d 619, 623 (6th Cir. 2017).[12] Under this alternative view,

13   parties alleging statutory mootness under section 363(m) must "prove that the reviewing

14   court is unable to grant effective relief without affecting the validity of the sale." *Id.*; *see*

15   *also In re ICL Holding Co., Inc.*, 802 F.3d 547, 554 (3d Cir. 2015) (finding, despite failure

16   to obtain a stay, section 363 did not moot the government's appeal concerning the

17   distribution of substantially all of the debtor's proceeds because the court could order

18   redistribution of the sale proceeds without disturbing the sale); *C.O.P. Coal Dev. Co. v.*

19   *C.W. Mining Co. (In re C.W. Mining Co.)*, 641 F.3d 1235, 1239 (10th Cir. 2011) (finding no

20   mootness albeit failure to obtain a stay where state law provided for equitable relief in the

21   form of a constructive trust on the proceeds of the conveyance at issue); *see also In re*

22   *Trism, Inc.*, 328 F.3d 1003, 1006–07 (8th Cir. 2003) ("The language of section 363(m)

23   ///

---

24           [11]*See also In re Vance*, 12 F. App'x 380, 382 (7th Cir. 2001) (citations omitted)
     ("Whether or not the sale was proper is irrelevant; where the sale has been approved by
25   the bankruptcy court under 11 U.S.C. § 363(b), a party must obtain a stay of the sale or
     else any appeal of the approval will become moot.").

26
27           [12]In an even more recent decision the Seventh Circuit has gone as far as holding
     that "§ 363(m) does not make any dispute moot or prevent a bankruptcy court from
28   deciding what shall be done with the proceeds of a sale or lease" and overturning its prior
     related decisions. *In Trinity 83 Dev., LLC v. ColFin Midwest Funding, LLC*, 917 F.3d 599
     (7th Cir. 2019).

moots any challenge to an order approving the sale of assets that satisfies two requirements. First, no party obtained a stay of the sale pending appeal. Second, reversing or modifying the authorization to sell would affect the validity of the sale or lease." (citations and marks omitted)). In *Brown*, the Sixth Circuit concluded that "[t]his is the superior interpretation of § 363(m) as it accommodates the provision's clear preference in favor of upholding the validity of bankruptcy sales without unduly restricting the appellant's right to contest errors of law made by the bankruptcy court." 851 F.3d at 623.

At least one decision from this district has classified the alternative approach as the "validity of sale exception." *In re USA Commercial Mortg. Co.*, No. 207CV-00072-RCJ-GWF, 2007 WL 2571947, at *6–*7 (D. Nev. Aug. 29, 2007). *In re USA Commercial Mortg. Co.* acknowledged that, at the time of that decision, the Ninth Circuit had recognized only two exceptions to section 363 mootness. *Id.* at *7–*9; *see Ewell v. Diebert (In re Ewell),* 958 F.2d 276, 280 (9th Cir. 1992) (recognizing exception to mootness only where (1) the debtor has a statutory right of redemption, and (2) other state law would permit the sale to be set aside).

Indeed for its part,  the Ninth Circuit has, in the past, consistently concluded that under section 363(m) failure to obtain a stay of sale of property to a good faith purchaser pending appeal renders an appeal of the order authorizing the sale moot without qualification beyond the two noted exceptions. *See In re Berkeley Delaware Court, LLC*, 834 F.3d 1036, 1040–41 (9th Cir. 2016) ("We have been reticent to carve out exceptions to the § 363(m) stay-of-sale requirement, and we again decline to do so now."); *Paulman v. Gateway Venture Partners III (In re Filtercorp, Inc.),* 163 F.3d 570, 576 (9th Cir. 1998) (providing that whether the appellate court "can fashion effective relief is immaterial," where purchaser of business assets bought in good faith and a stay was not obtained); *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.),* 846 F.2d 1170, 1171–73 (9th Cir. 1988) ("Finality in bankruptcy has become the dominant rationale for our decisions; the trend is towards an absolute rule that requires appellants

///

14

1    to obtain a stay before appealing a sale of assets."); *see also In re Ewell*, 958 F.2d at 280;

2    *Algeran, Inc. v. Advance Ross Corp., et. al.,* 759 F.2d 1421, 1423–24 (9th Cir. 1985).

3         However, in a more recent decision the Ninth Circuit appears to have shifted in

4    alignment with the narrower view of section 363(m) mootness. *See In re Spanish Peaks*

5    *Holdings II, LLC ("Spanish Peaks")*, 872 F.3d 892, 896 n.4 (9th Cir. 2017). In reaching the

6    merits of the key issue in *Spanish Peaks*, the Ninth Circuit rejected the contention that the

7    case was moot on the basis that the sale was approved and consummated. *Id.* The court's

8    expressed rationale for rejecting this argument was that "[b]y its terms, section 363(m)

9    preserves *the validity* of a sale challenged on appeal." *Id.* (emphasis in original). The Ninth

10   Circuit concluded that the case was not moot under the section because the outcome of

11   the appeal would not affect the sale's validity. *Id.* It particularly noted that the appellants

12   "have not asked us to undo the sale." *Id.*

13        At first glance the *Spanish Peaks* decision would suggest that the Appeals are not

14   moot because TTB may be deemed to assert that it does not seek to invalidate the sale

15   to Kash. (*See, e.g.*, ECF No. 26 at 3 ("The United States does not seek to overturn the

16   transfer of estate property to Kash CA . . . The purpose of the appeals is to preserve the

17   United States' rights under the tax lien, to prevent the transfer of non-estate property[, i.e.,

18   the Lien], and to challenge the agreement between Debtors and Kash CA that no proceeds

19   of sale may be used to pay any tax liabilities of any Debtor."); *id.* at 12 ("In respect to the

20   issues actually on appeal, the fact that Debtors' assets have been transferred to Kash CA

21   does not require that this Court "unscramble the eggs." Specifically, the priority and extent

22   of the United States' tax lien has not been determined and remains a live issue. The

23   proceeds of sale have not been distributed, so in that respect the consummation has not

24   occurred. Finally, as noted above, the sale of non-estate property [, i.e., the Lien,] is not

25   authorized by the Bankruptcy Code.").) Debtors-Appellees counter, however, that TTB's

26   claim that it is not seeking to overturn the transfer of estate assets to Kash is "misleading

27   and disingenuous." (ECF No. 29 at 7.) Without assigning such strong words, the Court

28   agrees with Debtors-Appellees.

15

The words TTB uses and the issues it raises are themselves telling. First, TTB's paramount contention is its claim that the bankruptcy estate included non-estate property—particularly Twin River's assets to which TTB claims the Lien attaches. (*E.g.*, ECF No. 26 at 11–12.)[13] TTB explicitly argues that such property was included in the assets sold to Kash and that such purchase was therefore not authorized by the Bankruptcy Code. (*Id.* at 12.) A verbatim recitation of the issues TTB raises in its opening brief on appeal also shows that TTB in fact challenges agreements and findings that were material to the culmination of the sale. The issues TTB presents are:

> 1. Whether the Bankruptcy Court erred and the United States' due process rights were violated, when the Bankruptcy Court impermissibly determined, first in an order approving compromises under Rule 9019, without an adversary proceeding or factual discovery, the relative priority and extent of the United States' lien against Debtors' and non-debtors' property, and by later reaffirming this order in its orders approving the sale procedures and sale.
>
> 2. Whether the Bankruptcy Court erred in approving Debtors/Sellers' proposed sales procedures, and by eventually approving the sale, without

---

[13]The Court is not certain about the current interplay between a contention that non-estate property was included in the bankruptcy estate and the issue of mootness under section 363(m). In *In re Rodeo Canon Dev. Corp.*, the Ninth Circuit concluded, outside of the context of section 363(m) and the issue of a failure to obtain a stay, that a bankruptcy court erred by allowing the sale of property free and clear where it did not adjudicate the equitable ownership of the property until after sale of the property. 362 F.3d 603, 608–09 (9th Cir. 2004), *opinion withdrawn and superseded*, 126 F. App'x 353 (9th Cir. 2005), *as amended on denial of reh'g* (Apr. 1, 2005). The decision was withdrawn after the ownership issue was resolved. *Id.* One case by a Ninth Circuit Bankruptcy Appellate Panel does consider *Rodeo* within the context of mootness and concludes that the bankruptcy court could not allow a sale to proceed without first determining the ownership interest. *See In re Popp*, 323 B.R. 260, 266 (B.A.P. 9th Cir. 2005). But this case and another case it relies on—*In re Focus Media, Inc.*, 378 F.3d 916 (9th Cir. 2004), *see id.* at 271—appear to be effectively overruled by *Blixseth* on standing grounds to the extent a property interest had not been determined by the petition date based on subsequent amendment of section 363(b)(1). *See* 942 F.3d at 1184–86 & n.5. Further, BAP cases are not binding. *See, e.g., In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 n.3 (9th Cir. 2013) (citing *Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir. 1990) ("As article III courts, the district courts must always be free to decline to follow BAP decisions and to formulate their own rules within their jurisdiction."))

Moreover, considering the argument as to the inclusion of "non-estate" property seems logically antithetical to a mootness doctrine because the issue clearly questions the entire propriety of the bankruptcy proceedings and goes into the merits of the case. *Cf. Weingarten Nostat, Inc. v. Serv. Merch. Co., Inc.*, 396 F.3d 737, 744 (6th Cir. 2005) ("To accept [the defendant's] argument would rob § 363(m) mootness of its force, since an appeal of a bankruptcy court order will typically question whether a given transaction is authorized by the bankruptcy code.").

requiring Debtors/Sellers to disclose with specificity what assets were being sold and demonstrate whether they were indeed the owners of such assets, when the United States contended that Debtors/Sellers had commingled their assets with those of non-debtor Twin River and that, even without proper disclosure, it appeared that Debtors/Sellers were seeking to sell non-estate property, and by denying the United States the opportunity to seek discovery on these issues.

3. Whether the Bankruptcy Court erred in approving sales procedures, and the eventual sale, that incorporated an asset purchase agreement that references an undisclosed subordination agreement between Debtors and the purchaser that appears to direct the proceeds of sale to creditors in ways that are contrary to Title 11 priorities and excludes payment of any taxes of any Debtor entity from the sales proceeds.

4. Whether the Bankruptcy Court erred and prevented a fair and competitive auction by its order approving compromises by allowing the purchaser of the Zions Bank claim to credit bid the full amount of the claim, where that relief was not requested in the motion to approve compromise and was based solely on the agreement of parties to the compromise, and by not requiring sufficient disclosure regarding this purchaser/stalking horse bidder and its connections to Debtors, David Howell, and associated entities in its order approving sale procedures, and by denying the United States the opportunity to seek discovery on the issue of whether Kash CA is a good faith purchaser under 11 U.S.C. § 363(m).

(ECF No. 32 at 4–5.)

These issues show that TTB's appeal in its essence would undermine the sale, even if the Court were to try to separate out the issue of whether TTB's Lien takes priority over other liens or continues to attach to the bankruptcy estate. Subsumed in this determination is also the Court's conclusion, as Debtors-Appellees argue, that all three orders constituting the Appeals were integral to the sale and its effectiveness. (*E.g.*, ECF No. 22 at 16–33; *see also* ECF No. 29 at 9–10 (contending that the issues TTB argues were all integral to the validity and effectiveness of the sale transaction); ECF No. 33-3 at 205 (Kash's counsel, at the hearing on the Compromise Motion, offering that it was key to the settlement agreements that, *inter alia*, there was "an *acknowledgment* as to the amount, the scope, the validity, perfection, and enforceability of the Zions first priority secured claims." (emphasis added)); ECF No. 25-1 at 3–4 (Daniel Kash—President of Kash—declaring that "If the Bankruptcy Court had not approved the Kash Settlement Agreement acknowledging Zions' first priority security interest and not approve Kash CA's right to credit bid under Section 363(k) of the Bankruptcy Code as part of the Compromise

1   Order . . . Kash CA would not have agreed to proceed with the Kash Loan Purchase
2   Agreement with Zions . . . and the Kash Asset Purchase Agreement would have been
3   terminated").).

4        Meaningfully, TTB does not expressly contest Debtors-Appellees' claim of the
5   integrality of the various orders appealed from, and caselaw supports that provisions
6   integral to the sale of assets affect the sale's validity. *See, e.g.*, *In re Trism, Inc.*, 328 F.3d
7   at 1007 (citations omitted) ("A provision is integral if the provision is so closely linked to
8   the agreement governing the sale that modifying or reversing the provision would
9   adversely alter the parties' bargained-for exchange."); *see also In re Stadium Mgmt. Corp.*,
10  895 F.2d 845, 849 (1st Cir. 1990) (finding sublease integral to a sale where "removing it
11  from the sale would have adversely affected the terms of the sale"); *but see In re PW,*
12  *LLC*, 391 B.R. 25, 35–36 (B.A.P. 9th Cir. 2008) (separating out the sale itself from the
13  terms of the sale and concluding the former was protected under section 363(m) but the
14  latter was not).[14]

15       In addition to these noted issues, *the relief* TTB seeks on appeal effectively goes
16  back to ground zero which would necessarily serve to unravel the various agreements at
17  the heart of the Sale Transaction. (*See* ECF No. 32 at 29 (asking the Court to reverse and
18  remand the action back to the Bankruptcy Court for further development of the facts
19  underlying the appealed issues, including for formal discovery).)

20       Accordingly, the Court concludes that section 363(m) bars consideration of the
21  Appeals, unless TTB has been able to successfully challenge the Bankruptcy Court's
22  finding that Kash is a good faith purchaser. *See In re Rimoldi*, 172 F.3d 876 (9th Cir. 1999)
23  (Table), 1999 WL 132260, at *1 n.2 (internal citation omitted) ("The mootness rule
24  ///

25  _____

26  [14]But, as noted above, BAP decisions are not binding on the Court. Further, the
    Court agrees with, at least, one noted decision which has found *In re PW, LLC*
27  unpersuasive. *See In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, No. 2:16-BK-17463-ER,
    2018 WL 1229989, at *5 (C.D. Cal. Jan. 19, 2018) ("A challenge to a material term of a
    sale, including that a sale is effectuated "free and clear" of others' interests in the property,
28  necessarily "affect[s] the validity of the sale." Thus, property interests that are stripped by
    authorization pursuant to § 363(f) are subject to the protection set forth in § 363(m).").

of section 363(m) applies only when a purchaser has bought an asset in good faith. Thus, an appellant can challenge the good faith of the purchaser on appeal even if the appellant did not obtain a stay of the sale."). The Court now turns to that issue.

"The burden of proof to show good faith is on the proponent of good faith, usually the party seeking dismissal of the appeal; it may not be assumed." 3 COLLIER ON BANKRUPTCY ¶ 363.11 (Alan N. Resnick & Henry J. Sommer eds.,16th ed. 2011). Relevantly, "neither the Bankruptcy Code nor the Bankruptcy Rules attempts to define 'good faith'." *In re Alpha Indus., Inc.*, 84 B.R. 703 (Bankr. D. Mont. 1988). However, "courts generally have followed traditional equitable principles in holding that a good faith purchaser is one who buys 'in good faith' and 'for value.'" *In re Ewell*, 958 F.2d at 281 (citation omitted). "Typically, lack of good faith is shown by 'fraud, collusion between the purchaser and other bidders or the [debtor in possession], or an attempt to take grossly unfair advantage of other bidders.'" *Id.* (quoting *In re Suchy*, 786 F.2d 900, 902 (9th Cir. 1985)).

TTB does not challenge the substance of the Bankruptcy Court's finding that Kash was a good faith purchaser (*see* ECF No. 24-8 at 7, 14). TTB only notes that it contested the issue in the bankruptcy proceedings. (ECF No. 26 at 11; *see also* ECF No. 32 at 27–28 (TTB expressly stating in its opening brief that it "does not ask the Court to overturn" the Bankruptcy Court's finding that Kash was a good faith purchaser under section 363).) This being the case, TTB therefore does not challenge that there is sufficient evidence in the record on appeal to support the Bankruptcy Court's finding that Kash was a good faith purchaser. Nonetheless, TTB assertedly contests the Bankruptcy Court making this finding purportedly without first allowing TTB an opportunity for discovery to develop the facts. (*Id.* at 28.)

As to the issue of discovery, Debtors-Appellees counter that TTB had sufficient opportunity to take discovery and even if it did not, TTB could have asked the Bankruptcy Court to take additional discovery. (ECF No. 43 at 28, 33–36; *see also* ECF No. 29 at 15 n.12 (providing that TTB's ability to take discovery was not "impaired").) The Court finds

1  the record supports that the Bankruptcy Court did not bar TTB from taking additional
2  related discovery, and TTB did not request it.

3       The finding that Kash was a good faith purchaser was made after the evidentiary
4  hearing on the Sale Motion. (*See* ECF No. 24-8 at 7, 14; ECF No. 33-7 at 184–290
5  (Transcript).) At that hearing, TTB's counsel expressed a desire for more discovery in one
6  regard—to uncover what assets were being sold. (ECF No. 33-7 at 216–17.) Counsel
7  answered yes to the court's question as to whether he wanted to conduct 30(b)(c)
8  depositions on the issue after counsel revealed TTB had not conducted such depositions
9  due to the parties' settlement discussions. (*Id.* at 217.) In the next sentence TTB's counsel
10 turned to the issue of determining whether Kash is a good faith purchaser. (*Id.*) At no point,
11 however, did TTB's counsel raise the issue of taking additional discovery concerning the
12 determination of Kash's status as a good faith purchaser. (*See generally id.* at 217–90.) It
13 is particularly notable that the issue was the chief issue at the hearing, the parties offered
14 relative evidence and TTB was allowed to present its witness to challenge a good faith
15 finding. (*Id.*) Therefore, at minimum, to the extent TTB felt it needed more discovery on
16 the good faith issue, TTB waived discovery by proceeding with the hearing and never in
17 fact requesting additional discovery on the issue. *See, e.g.*, *In re Walldesign, Inc.*, No. CV
18 15-01844-VAP, 2017 WL 1228396, at *8 (C.D. Cal. Mar. 31, 2017) (citation omitted) ("A
19 reviewing court will only find that a lower court abused its discretion if the movant diligently
20 pursued its *previous* discovery opportunities, and if the movant can show how allowing
21 *additional* discovery would have precluded summary judgment.") (emphasis in original).

22      Further, while the substance of the Bankruptcy Court's good faith finding is not
23 properly before this Court, the Court additionally concludes that the Bankruptcy Court did
24 not commit clear error in making the finding. First, at the hearing, there was no real
25 challenge that Kash paid good value for the assets it purchased. (*See* ECF No. 33-7 at
26 201; *id.* at 193–94 (stating the work that went into getting value for unsecured creditors
27 with the support of the Committee of Unsecured Creditors); *id.* at 201 (TTB's counsel
28 ///

1    conceding that "[t]here is no question that enormous value is being provided by Kash
2    CA").)

3        TTB's opposing contentions, however, chiefly focused on the relationship between
4    Debtors-Appellees and particularly Howell and the president of Kash and that the sale
5    would exclude a payout for taxes. (*E.g.*, *id.* at 217, 221.) That Kash was a party in the
6    bankruptcy proceedings and was thereby aware of TTB's Lien could lead to an inference
7    that Kash was a non-statutory insider of Debtors-Appellees.[15] Assuming that to be the
8    case, that issue combined with the close relationship between Howell and Kash very well
9    could have weighed against a finding of good faith. But as the Committee of Unsecured
10   Creditors and Debtors-Appellees argued below (*id.* at 59, 107), even assuming Kash is an
11   insider, insider status itself does not preclude a "good faith" finding. *See, e.g.*, *In re*
12   *Filtercorp, Inc.*, 163 F.3d at 577 (affirming good faith finding as not clearly erroneous in
13   favor of insider-buyer); *see also Old Cold, LLC*, 558 B.R. 500, 516 (B.A.P. 1st Cir. 2016)
14   ("[A] sale to an insider, without more, does not establish a lack of good faith."). The
15   Committee of Unsecured Creditors also noted in the bankruptcy proceedings that the "pre-
16   existing business relationship and friendship . . . ha[d] been extensively disclosed by both
17   the Debtors and Kash." (ECF No. 33-7 at 59.)

18       Furthermore, the evidence shows that Debtors-Appellees unsuccessfully pursued
19   multiple other potential purchasers aside from Kash. (*See id.* at 116–17 (declaration of
20   CRO, J. Michael Issa noting the various potential purchasers who had engaged in
21   negotiations with Debtors); *see also id.* at 82, 87–88 (Debtors-Appellees stating in gist
22   that there were protracted negotiations with prior purchasers that were never effectuated
23   for various reasons and that TTB never objected to the adequacy of the Debtors' marketing
24   of assets and properties).) Moreover, while TTB did present a witness—Thomas Schmidt,
25   ///

---

26       [15]Section 101(31) provides a list of those persons that are statutorily considered
27   "insiders" under the Bankruptcy Code. *See* 11 U.S.C.A. § 101(31). "A non-statutory insider
     is a person who is not explicitly listed in § 101(31), but who has a sufficiently close
28   relationship with the debtor to fall within the definition." *In re The Vill. at Lakeridge, LLC*,
     814 F.3d 993, 999 (9th Cir. 2016) (citation omitted).

1  one of the prior potential purchasers—to undermine the good faith status of the sale to

2  Kash, material parts of TTB's witness's testimony were determined to be inadmissible

3  hearsay—lacking in personal knowledge. (*See* ECF No. 33-7 at 203, 231, 254, 256, 258,

4  274–75; *see also* ECF No. 33-7 at 19–22 (contending that Schmidt's declaration consisted

5  of false statements).) On the whole then, the evidence does not support a finding that the

6  Bankruptcy Court committed clear error in finding Kash to be a good faith purchaser.

7      In sum, considering the evidence and issues before the Court, the Court finds that

8  the Appeals are statutorily moot based on section 363(m). The Court will accordingly grant

9  Debtors-Appellees' motion to dismiss TTB's appeals of the Sale Order, the Compromise

10  Order and Sales Procedures Order, all of which were integral to the Sale Transaction.

11  **V.    CONCLUSION**

12      The Court notes that the parties made several arguments and cited to several cases

13  not discussed above. The Court has reviewed these arguments and cases and determines

14  that they do not warrant discussion as they do not affect the outcome of the appeals before

15  the Court.

16      It is therefore ordered that Debtors-Appellees' motion to dismiss (ECF No. 22) is

17  granted as set forth herein. TTB's appeals of the Compromise Order (Case No. 3:19-cv-

18  00637-MMD), Sale Procedures Order (Case No. 3:19-cv-00666-MMD), and Sale Order

19  (Case No. 3:19-cv-00667-MMD) are dismissed.

20      This order and the Court's prior order (ECF No. 76) resolve all four appeals in this

21  consolidated case.  Accordingly, the Clerk of the Court is instructed to enter judgment in

22  accordance with these orders and close the case.

23      DATED THIS 3rd day of August 2020.

24

25                                                    _____

26                                                    MIRANDA M. DU
                                                      CHIEF UNITED STATES DISTRICT JUDGE

27

28